UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL L. GIPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-01710-SEB-DML |
| | ) | |
| LIBERTY MUTUAL AGENCY | ) | |
| MARKETS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 56], filed on April 17, 2015, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Michael L. Gipson ("Mr. Gipson"), proceeding *pro se*, brings this claim against his employer, Defendant Liberty Mutual Agency Markets ("Liberty Mutual"), alleging that Liberty Mutual failed to provide him with a reasonable accommodation for his disability and retaliated against him for engaging in statutorily protected activity, in violation of the Americans with Disabilities Act ("ADA"). Plaintiff has failed to respond to this motion. For the reasons detailed below, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>**

Mr. Gipson works for Liberty Mutual as a Claims Customer Service Representative ("CSR"), a non-exempt position. Declaration of Jada Cazares, ¶ 5 ("Exh.

1

B"); Job Description for CSR Position ("Exh. B-1"). As a CSR, Mr. Gipson's duties include handling calls from customers concerning claims under various types of insurance policies, including automotive and property insurance policies. Deposition of Michael Gipson at 102-03 ("Exh. A").

**Defendant's Performance Metrics**

CSRs are often the first "responders" for Liberty Mutual fielding calls from customers who call in to report an accident or other loss. An essential part of the CSR's responsibility is to provide such callers with quality service. Exh. B ¶ 6. For that purpose, Liberty Mutual has developed standard performance metrics for its CSRs to ensure that its customers receive quality service. These metrics include the Quality Assurance ("QA") metric, the Adherence metric, and the Average Handling Time ("AHT") metric. Exh. A at 59-64, 96; Exh. B ¶ 7.

The QA metric assesses the quality of the customer service a CSR provides during such a telephone call. Exh. A at 63-64; Exh. B ¶8. Each month, Liberty Mutual randomly selects for audit three to five customer calls from each CSR to determine whether the CSR complied with Liberty Mutual's established guidelines for handling the calls. Exh. A at 63-65; Exh. B ¶ 8. A score is assigned for each audited call and those scores are thereafter tallied to determine the CSR's monthly QA metric score. Exh. B ¶ 8.

The Adherence metric assesses the amount of time a CSR is logged in and available to receive calls during his or her scheduled work time (excluding scheduled

breaks).  If a CSR is scheduled to begin work at 8:30 a.m., but does not log in until 8:45 a.m., this delay will be reflected in the CSR's Adherence score.  Exh. A at 61; Exh. B ¶ 9. CSRs are required to meet a designated Adherence percentage goal.  For example, if the Adherence goal is 94%, the CSRs are required to be logged in for 94% of their scheduled work hours.  Exh. B ¶ 9.

The AHT metric assesses a CSR's efficiency in handling customer calls and performing the necessary follow-up work related to the call.  This metric is calculated by adding the amount of time spent on a call ("Average Talk Time") and the amount of time spent performing the necessary follow-up work to respond to the matters raised by the caller ("After Call Work").  To achieve the AHT goal, CSR's must receive an AHT score that is less than or equal to the designated AHT metric goal.  Exh. B ¶ 10.

Every CSR is required to meet the QA, Adherence, and AHT metrics on a monthly basis, and the metrics are listed as standard performance objectives on CSRs' yearly performance evaluations.  Exh. A at 96-97; Exh. B ¶ 11; Plaintiff's Performance Evaluations ("Exh. C-1").  Liberty Mutual's job description for the CSR position specifically includes the following as a job responsibility: "Processes policyholder transactions accurately and within established Contact Center Standards.  Manages and utilizes time effectively to ensure the required service levels for call capture and service handle time as well as quality and customer satisfaction standards are met."  Exh. B-1.

**Plaintiff's Performance Issues**

Throughout his employment with Liberty Mutual, Mr. Gipson consistently struggled to meet the company's performance standards, particularly the QA and AHT metrics.  Declaration of Paige Kramer ("Exh. C") ¶ 4; Exh. C-1.  Mr. Gipson testified that he believed he has only met the AHT metric goal "two or three times" during his employment.  Exh. A at 97.  On his 2011 Objective Setting and Performance Evaluation Form ("OSPE"), Mr. Gipson received a "met" expectations rating in three of the seven individual performance objectives.  Mr. Gipson received two ratings of "partially met" expectations and two ratings of "did not meet" expectations on the remaining four objectives.  Exh. C-1.

On December 15, 2011, Mr. Gipson received a verbal warning from his manager, Denice Meeks, for failing to consistently meet his AHT and QA metrics.  Exh. A at 119-120; Exh. 11 to Exh. A.  Mr. Gipson was told that his failure to meet the performance metrics in the future could result in further disciplinary action, such as a written warning.  Exh. 11 to Exh. A.

**Plaintiff's Involvement in Company-Sponsored Volunteer Work**

Liberty Mutual sponsors an annual event titled "Serve with Liberty," which allows employees to choose to volunteer for certain organizations during work hours.  Exh. A. at 76-77; Exh. C ¶ 16.  Participation in Serve with Liberty is completely voluntary; employees are neither rewarded nor penalized in any way for volunteering or choosing not to volunteer.  Exh. A at 77; Exh. C ¶ 16.  Employees receive no additional pay or benefits for participating in the event.  *Id.*

On April 17, 2012, Nikki Derolf, the Indianapolis coordinator of the Serve with Liberty project, sent an email to several employees, including Mr. Gipson, with the subject line: "Serve with Liberty Team Members."  The email provided in relevant part: "Does anyone want to be an area team leader on June 21 or June 22?  I'm trying to get things assigned and situated."  (Email regarding Serve with Liberty ("Exh. D-1")).  Mr. Gipson forwarded this email to Michael Casey, who was then employed as Liberty Mutual's Claims Contact Center Assistant Operations Manager, asking Mr. Casey if "this was something [Mr. Gipson could] do for the Hunger for Kids [organization] that is going to be here?" Exh. D-1.  Mr. Gipson testified that at the time he sent this email, he believed that he had been appointed his department's "leader" of Serve with Liberty. Exh. A at 75-77.  Mr. Casey responded to Mr. Gipson on April 19, 2012, informing him that Cheryl Clayton, a manager in the CSR department, had been assigned to be the project leader.  *Id.* at 109-111; Exh. D-1.

Mr. Casey had determined that the project leader for the Serve for Liberty event should preferably be a management employee because a manager could properly coordinate scheduling volunteers – many of whom were non-exempt employees – time off work to attend the event.  Declaration of Michael Casey ("Exh. D") ¶ 6.

**Plaintiff Seeks an Accommodation**

Early in April 2012, Mr. Gipson informed Ms. Meeks, his supervisor at the time, that he had been diagnosed with attention deficit hyperactivity disorder ("ADHD") and that it was possible that his ADHD was affecting his ability to meet his performance

metrics.  Exh. A at 81-82.  Ms. Meeks instructed Mr. Gipson to bring in a doctor's note and to contact Human Resources ("HR") about his possible need for accommodation.  *Id.* at 81-82.

Following their conversation, Mr. Gipson provided Ms. Meeks with a letter from his physician dated April 2, 2012, which stated: "[Mr. Gipson] has been treated for adult attention deficit disorder for many years.  This can affect his concentration and productivity."  Exh. 8 to Exh. A.  Mr. Gipson also contacted HR on April 17, 2012 to request an accommodation.  Exh. A at 84, 138-39.  On that same day, Mr. Gipson sent the above referenced email to Mr. Casey asking if he could be appointed an area leader for the Serve with Liberty volunteer event.  Exh. D-1.  Two days thereafter, Mr. Casey responded informing Mr. Gipson that Ms. Clayton was going to be the project leader. Mr. Casey has testified that, at the time he responded to Mr. Gipson, he was unaware that Mr. Gipson had made a request for accommodation based on his ADHD.  Exh. D ¶ 7.

On April 27, 2012, Liberty Mutual sent Mr. Gipson's physician a Request for Medical Information Form to complete and return.  Exh. A at 85-86; Exh. 9 to Exh. A. On May 11, 2012, Liberty Mutual received the completed form on which Gipson's physician confirmed that Mr. Gipson had been diagnosed with ADHD, stating that ADHD "[p]robably affects [Mr. Gipson's] … concentration, timeliness, and working in a timely manner."  Exh. 9 to Exh. A ¶ 2.  The doctor further opined in response to the question regarding how the impairment impacted Mr. Gipson's ability to perform his job, that it would "slow [the] employee" and "decrease productivity."  *Id.* ¶ 6.  Mr. Gipson's

physician did not recommend any specific accommodation, but merely stated that Liberty Mutual should have "consideration for [Mr. Gipson's] impairment." *Id.* ¶ 7.  The doctor concluded that Mr. Gipson could perform the essential functions of the CSR position, "but not at the speed someone else might." *Id.* ¶ 10.

On May 17, 2012, after receiving the completed Request for Medical Information Form, Leah Chen, HR Generalist, met with Mr. Gipson to discuss his accommodation request.  Exh. C ¶ 6.  During this conversation, Mr. Gipson reported that he struggled with the AHT metric as it took him "longer to go through the calls" because he would frequently forget to ask the caller various questions.  Exh. C-1.  Mr. Gipson further stated that his ADHD affected his Adherence and QA metrics.  Mr. Gipson requested that Liberty Mutual accommodate his disability by increasing the AHT metric goal (i.e., the amount of time in which a call must be completed).  *Id.*

**Plaintiff Receives Written Warning**

On April 29, 2012, prior to Liberty Mutual's receipt of the completed Request for Medical Information Form, Operations Manager Robyn Yates sent an email to Ms. Meeks inquiring as to the reason(s) certain CSRs, including Mr. Gipson, had not been given progressive discipline in light of their performance deficiencies.  Declaration of Robyn Yates ("Exh. E") ¶ 4; Email from Yates to Meeks ("Exh. E-1").  On May 15, 2012, Ms. Meeks issued a written warning to Mr. Gipson and a sixty-day performance improvement plan based on his consistent failure to meet the QA and AHT metrics.  Exh. A at 124-25; May 2012 Written Warning ("Exh. 12 to Exh. A").  Ms. Yates did not direct

Ms. Meeks to issue this warning to Mr. Gipson; further, Ms. Yates was not aware that

Mr. Gipson had requested an accommodation at the time he was issued the written

warning.  Exh. E ¶¶ 5-6.

Prior to receiving this written warning, Mr. Gipson had met his QA metric goal in

only three of the previous eight months and had failed to meet his AHT goal every month

during that same time period.  Exh. 12 to Exh. A.  The written warning given to Mr.

Gipson had no effect on his job title, pay, or benefits nor did it prevent him from applying

for internal positions with Liberty Mutual.  Exh. B ¶ 18; Exh. C ¶ 15.  On July 15, 2012,

Mr. Gipson successfully completed his performance improvement plan and was released

from the strictures of the written warning.  Exh. A at 134-35; Exh. C ¶ 13; Performance

Improvement Plan Completion ("Exh. C-10").

**Defendant's Attempts to Accommodate Plaintiff**

On June 7, 2012, Ms. Chen sent Mr. Gipson an email requesting additional

information about his accommodation request.  Exh. C ¶ 7; Email from Chen to Gipson

("Exh. C-4").  In the email, Ms. Chen informed Mr. Gipson that Liberty Mutual was not

required to lower metric or production standards in order to accommodate him, but that

the company would consider implementing any tools that would allow him to meet the

metric standards.  Exh. C-4.  Following a number of discussions with Mr. Gipson

regarding his accommodation request, Liberty Mutual provided the following

accommodations for Mr. Gipson: (1) additional training in the form of several side-by-

side sessions with supervisors and senior CSRs; and (2) scheduling his breaks two hours apart.  Exh. A at 85-86, 139; Exh. 9 to Exh. A; Exh. C ¶ 11; Exhs. C-5-C-7.

After Mr. Gipson completed his performance improvement plan and was removed from his written warning in July 2012, he continued to have performance issues, particularly in meeting his Adherence and AHT metrics.  In his 2012 performance review, he received a "partially met" expectations rating in two areas: Adherence and insight coaching.  Exh. C-1.  With respect to the Adherence metric, the comments section provided that Mr. Gipson continued his "ongoing trend" of logging in late, which affected his Adherence score.  Mr. Gipson also received a "did not meet" expectations rating with respect to the AHT metric, despite having received additional training in the form of side-by-side reviews with senior CSRs.  *Id.*

**Plaintiff's Charge of Discrimination**

On November 3, 2012, Mr. Gipson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Liberty Mutual violated the ADA with respect to his employment.  On July 25, 2013, the EEOC issued a dismissal and notice of rights.  Exh. C-9.

**Plaintiff Receives Second Written Warning**

In June 2013, Mr. Gipson was transferred from the Commercial Insurance Unit to the Personal Insurance Unit ("PI"), where he currently works.  As a PI CSR, Mr. Gipson performs the same duties as those he performed as a Commercial Insurance CSR, except

9

that, instead of answering calls from policyholders of commercial insurance, he answers calls from individuals regarding their personal insurance accounts.  *Id.* ¶ 13.  PI CSRs are required to meet the same QA, Adherence, and AHT metrics as other CSRs.

Jada Cazares supervises Mr. Gipson in the PI Unit.  Exh. B ¶ 4.  Shortly after Mr. Gipson began working in the PI Unit, Ms. Cazares began to notice the same performance issues, such as arriving late for work and returning late from his breaks throughout the day.  These behaviors impacted his Adherence goals; he also continued to fail to meet his AHT metric goals.  *Id.* ¶ 14.  Because his deficient performance was ongoing and because Mr. Gipson was not showing improvement despite his having received coaching, on July 16, 2013, Ms. Cazares decided to place him on a second written warning and sixty-day performance improvement plan to address his Adherence and AHT difficulties.  *Id.* ¶¶ 15-16.  Ms. Cazares did not consult Ms. Yates or ask her to review the second written warning before she issued it to Mr. Gipson.  As with the previous written warning, it had no effect on his job title, pay, or benefits nor did it prevent him from applying for internal company positions.  Exh. C ¶ 15; Exh. 14 to Exh. A.  We are informed that Mr. Gipson currently remains employed by Liberty Mutual as a CSR and has not been demoted.  Exh. A at 155; Exh. C ¶ 14.

**The Instant Litigation**

On October 24, 2013, Mr. Gipson filed his Complaint, *pro se*, alleging that Liberty Mutual has failed to accommodate him and retaliated against him for engaging in statutorily protected activity, in violation of the ADA.  Liberty Mutual filed its Motion

for Summary Judgment on April 17, 2015.  Mr. Gipson did not file a response to that motion.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See *id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but it is mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

Mr. Gipson has not filed any response in opposition to Liberty Mutual's motion for summary judgment. He has therefore conceded Liberty Mutual's version of the facts for the purpose of the court resolving this motion. *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 286 (7th Cir. 1997). This does not alter the standard for assessing a Rule 56(c) motion, but does "reduc[e] the pool" of evidence from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

## II.    Claim of Failure to Accommodate

Mr. Gipson claims that Liberty Mutual has failed to accommodate his disability as required by the ADA.  To establish a prima facie case for failure to accommodate, Mr. Gipson must show that: (1) he is a qualified individual with a disability; (2) Liberty Mutual was aware of his disability; and (3) Liberty Mutual failed to reasonably accommodate the disability.  *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011) (citation omitted).  Liberty Mutual contends that it is entitled to summary judgment on this claim because Mr. Gipson cannot establish that he is a qualified individual with a disability or that it failed to reasonably accommodate his disability.

A "qualified individual with a disability" is defined by the ADA as an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  In his deposition testimony, Mr. Gipson conceded that he is unable to meet the AHT metric because of his ADHD and that there is no accommodation that would allow him to meet this metric.  Exh. A at 60, 95-96.  Accordingly, whether Mr. Gipson is a qualified individual under the ADA depends on whether the AHT metric goal is an essential function of the CSR position.

In determining whether a particular duty constitutes an essential function, courts consider "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences."  *Gratzl v. Office of Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir.

13

2010) (quotations and citation omitted).  Here, Liberty Mutual posits that the AHT metric goal is an essential function of the CSR position and Mr. Gipson has presented no evidence or argument otherwise.

Although the CSR job description does not specifically state that CSRs must meet the AHT requirement, one of the job responsibilities listed therein requires that CSRs "process[] policyholder transactions accurately *and within established Contact Center standards*." Exh. B-1 (emphasis added).  The undisputed evidence establishes that the AHT metric is a uniform production standard that Liberty Mutual has put in place and consistently requires *all* of its CSRs to meet on a monthly basis to help ensure that its CSRs are providing quality service to its customers.  The job description further requires CSRs to "manage[] and utilize[] time effectively to ensure the required service levels for call capture and service handle time," which is exactly what the AHT metric is designed to measure.  *Id.*  Thus, the job description supports the conclusion that meeting the AHT requirement is an essential function of the position.  This conclusion is buttressed by the fact that the AHT metric is listed as a standard performance objective on CSRs' yearly performance evaluations and all CSRs are evaluated based on this metric.  *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 490 (7th Cir. 2014) (finding that regular attendance was an essential function of the position in part because the employer regularly evaluated its employees on "Attendance and Punctuality").

Mr. Gipson has not presented any evidence or argument to contradict Liberty Mutual's contention that the AHT metric goal is an essential function of the CSR

14

position.  Accordingly, because Liberty Mutual has set forth sufficient evidence in support of its position, we find that the AHT metric goal is in fact an essential function of Mr. Gipson's job.  *See Gratzl*, 601 F.3d at 679 ("We presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary.").  Given that Mr. Gipson conceded in his deposition that he is unable to meet the AHT metric with or without accommodation, he has failed to show that he is a qualified individual with a disability entitled to the protections of the ADA.  Liberty Mutual is therefore entitled to summary judgment on Mr. Gipson's failure to accommodate claim.

Even if Mr. Gipson could show that he is a qualified individual with a disability, it is clear that the various potential accommodations he requests, to wit, eliminating the AHT metric requirement as it applies to him and allowing him to complete his calls without any time restraints; increasing the AHT metric goal to allow him more time to complete the calls; or assigning him only one type of call to handle; are not reasonable accommodations under the ADA.  Because satisfying the AHT metric goal is an essential function of the position, Liberty Mutual is not required to eliminate that function or lower its production standards in order to accommodate Mr. Gipson.  *See, e.g.*, *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 484 (7th Cir. 2002) (holding that an employer is "not required to modify, reduce, or reallocate the essential functions of a job to accommodate an employee"); *Kelley v. Amazon.com, Inc.*, No. 12-CV-5132-TOR, 2013 WL 6119229, at *8-*11 (E.D. Wash. Nov. 21, 2013) (holding that the defendant

was not required under the ADA to lower its customer satisfaction targets for a customer service associate as the targets were essential functions of the position).  For these reasons, Mr. Gipson's failure to accommodate claim fails as a matter of law.

## III.    Retaliation

Mr. Gipson also claims that Liberty Mutual unlawfully retaliated against him for: (1) requesting an accommodation in April 2012; and (2) filing an EEOC charge of discrimination in November 2012.  Mr. Gipson testified that Liberty Mutual retaliated against him for requesting an accommodation by "removing" him as the leader of Serve with Liberty and issuing a written warning to him on May 12, 2012.  Mr. Gipson alleges that in response to his filing an EEOC charge, Liberty Mutual again retaliated against him by issuing a second written warning on July 16, 2013.

In order to prove retaliation under the direct method of proof, Mr. Gipson must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) that there is a causal link between the two.  *Taylor-Novotny*, 772 F.3d at 494.  Liberty Mutual does not dispute that Mr. Gipson engaged in protected activity, but contends that his retaliation claim cannot survive summary judgment because he cannot establish (and has not established) that he suffered from an adverse employment action or that any such adverse action was based on his having engaged in protected activity.

An adverse employment action in the retaliation context is an action that is likely to "dissuade a reasonable worker from making or supporting a charge of discrimination."

*Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 558 (7th Cir. 2008) (quotation marks and

citation omitted).  In other words, an adverse employment action must be "materially"

adverse not merely a "trivial harm."  *Brown v. Advocate South Suburban Hosp.*, 700 F.3d

1101, 1106 (7th Cir. 2012).  None of the actions cited by Mr. Gipson meets this standard.

Even assuming that Liberty Mutual in fact removed Mr. Gipson as a leader of the

Serve with Liberty project (which is a role Liberty Mutual denies he ever held in the first

place), his removal does not constitute an adverse employment action.  As the undisputed

evidence establishes, the Serve with Liberty event is voluntary; employees are neither

rewarded for participating nor penalized for failing to participate, and they are not

provided any additional pay or benefits for volunteering.  As Liberty Mutual argues, in

order to constitute an adverse employment action, at a minimum there must be some sort

of tangible job consequences, to wit, some quantitative or qualitative change in the terms

and conditions of employment.  *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892,

901, 902 (7th Cir. 2003) (noting that, although the "definition of an adverse employment

action is generous," an employee "must show some quantitative or qualitative change in

the terms and conditions of his employment" or some sort of "real harm").  Mr. Gipson's

failure to be chosen to lead a voluntary event for which there were no job related benefits

or penalties associated with participation or non-participation is insufficient to meet this

standard.

The two written warnings received by Mr. Gipson also do not rise to the level of

an adverse employment action.  The Seventh Circuit has consistently held that written

reprimands, without more, are insufficient to constitute adverse employment actions. *E.g.*, *Chaib v. Indiana*, 744 F.3d 974, 987 (7th Cir. 2014) (holding that "even under the more generous standard that governs retaliation claims," a reprimand "without more" is not an adverse employment action). Here, the undisputed evidence establishes that the written warnings issued by Liberty Mutual did not have any effect on Mr. Gipson's job title, pay, or benefits, nor did they prevent him from seeking an internal promotion. Without some real effect on his employment, these warnings fall short of constituting adverse employment actions.

For these reasons, Mr. Gipson has failed to demonstrate that he suffered an adverse employment action. Accordingly, his retaliation claim cannot survive summary judgment and we need proceed no further in our analysis of this claim.

## IV.   Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:   _____12/22/2015_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MICHAEL L. GIPSON
708 S. Rangeline Road
Anderson, IN 46012

Ryan C. Fox
FOX WILLIAMS & SINK LLC
rfox@fwslegal.com

Melissa K. Taft
JACKSON LEWIS P.C. - Indianapolis
melissa.taft@jacksonlewis.com

Michael W. Padgett
JACKSON LEWIS P.C. - Indianapolis
padgettm@jacksonlewis.com